# EXHIBIT A

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT B

**Wasserman, Jill**

**Subject:** FW: Secure Networx, Serial No. 2,939,034

**From:** Sharkin, Keith
**Sent:** Monday, July 31, 2006 8:36 AM
**To:** Wasserman, Jill
**Subject:** FW: Secure Networx, Serial No. 2,939,034

**From:** Adam Ezer [mailto:adamezer@gmail.com]
**Sent:** Saturday, July 29, 2006 3:13 AM
**To:** Sharkin, Keith
**Cc:** adamezer@gmail.com
**Subject:** Secure Networx, Serial No. 2,939,034

Dear Keith:

As you may be aware, you have been listed in error as the attorney of record by the USPTO for the above captioned mark.

As I had advised you prior to our settlement agreement, Secure Networx had initiated a transfer of it's entire interest from the Delaware corporation to the Canadian company of the same name. It turns out that the transfer occurred on the same day as requested, namely, July 26, 2005. This is despite the fact that the USPTO's website stated that the process could take much longer to complete.

Therefore, Secure Networx Corp., the Delaware company, could not make the agreement that was submitted to the USPTO and the Federal Court, District of Delaware, as it no longer had any interest in the mark. I advised the USPTO of the situation and requested reinstatement on behalf of the Canadian company as soon as I learned of the situation in February 2006.

I will advise the USPTO by fax of the error respecting the listing of yourself as our attorney, and advise them that I should remain the correspondence contact if permitted, and that our attorney of record is Mr. Richard L. Morris Jr., whose address is below.

I can advise you that Secure Networx Corp., now the InternetTrust Foundation, of Delaware, will continue to honour our settlement agreement. If you wish Secure Networx, the Canadian company to consider requesting the cancellation of the above captioned mark, this is something we can discuss.

Thank you for your attention to these matters. I do note in passing that I reviewed your clients' applications and Ms. Nye is still the attorney of record for application 78587104 for STEELCLAD EMAIL (using your firm's address), which mark was deemed abandoned after no response. I understand Ms. Nye left your firm some time ago, and if this has led to mistake your client has two months from July 14, 2006 to take further action to revive the application.

Adam J. Ezer
778 371 9182

ICHARD L. MORRIS, JR.
O BOX 398538
MIAMI BEACH FL 33239-8538

8/28/2006

# EXHIBIT C

**Wasserman, Jill**

Subject:                FW: Fwd: Secure Networx, Serial No. 2,939,034

```
-----Original Message-----
From: Sharkin, Keith
Sent: Friday, August 11, 2006 5:28 PM
To: Wasserman, Jill
Subject: Fw: Fwd: Secure Networx, Serial No. 2,939,034


-----Original Message-----
From: Adam Ezer <adamezer@hotmail.com>
To: adamezer@gmail.com <adamezer@gmail.com>
CC: Sharkin, Keith <KSharkin@KSLAW.com>
Sent: Fri Aug 11 16:28:47 2006
Subject: RE: Fwd: Secure Networx, Serial No. 2,939,034
```

Dear Keith:

It has come to my attention that instead of replying to my email below, action
has been taken to have the mark cancelled again.  This is unfortunate.  The
matter is going to a board attorney on Monday.  It appears clear to me that
the Delaware company could not request the cancellation of the mark to which
it had assigned all rights away to the Canadian company.

It appears to me that your actions, or those of your associates, are in bad
faith.  Accordingly, there will be a petition to cancel your client's mark
SECUREWORKS, over which you have indicated there has been actual confusion, or
a likelihood of confusion.  Please ensure your client is aware that this
petition is due to your actions.

Thank you.

Adam Ezer

_____

```
From:  "Adam Ezer" <adamezer@gmail.com>
To:  "Adam Ezer" <adamezer@hotmail.com>
Subject:  Fwd: Secure Networx, Serial No. 2,939,034
Date:  Sat, 29 Jul 2006 00:15:42 -0700



---------- Forwarded message ----------
From: Adam Ezer <adamezer@gmail.com>
Date: Jul 29, 2006 12:12 AM

Subject: Secure Networx, Serial No. 2,939,034
To: "Sharkin, Keith" <KSharkin@kslaw.com>
Cc: adamezer@gmail.com
```

1

Dear Keith:

As you may be aware, you have been listed in error as the attorney of record by the USPTO for the above captioned mark.

As I had advised you prior to our settlement agreement, Secure Networx had initiated a transfer of it's entire interest from the Delaware corporation to the Canadian company of the same name. It turns out that the transfer occurred on the same day as requested, namely, July 26, 2005. This is despite the fact that the USPTO's website stated that the process could take much longer to complete.

Therefore, Secure Networx Corp., the Delaware company, could not make the agreement that was submitted to the USPTO and the Federal Court, District of Delaware, as it no longer had any interest in the mark. I advised the USPTO of the situation and requested reinstatement on behalf of the Canadian company as soon as I learned of the situation in February 2006.

I will advise the USPTO by fax of the error respecting the listing of yourself as our attorney, and advise them that I should remain the correspondence contact if permitted, and that our attorney of record is Mr. Richard L. Morris Jr., whose address is below.

I can advise you that Secure Networx Corp., now the InternetTrust Foundation, of Delaware, will continue to honour our settlement agreement. If you wish Secure Networx, the Canadian company to consider requesting the cancellation of the above captioned mark, this is something we can discuss.

Thank you for your attention to these matters. I do note in passing that I reviewed your clients' applications and Ms. Nye is still the attorney of record for application 78587104 for STEELCLAD EMAIL (using your firm's address), which mark was deemed abandoned after no response. I understand Ms. Nye left your firm some time ago, and if this has led to mistake your client has two months from July 14, 2006 to take further action to revive the application.

Adam J. Ezer
778 371 9182

RICHARD L. MORRIS, JR.
PO BOX 398538
MIAMI BEACH FL 33239-8538

2

# EXHIBIT D

Adam J. Ezer
114-3755 West 6th Ave.
Vancouver, BC, V6R 1T9
(778) 371-9182 Tel.

| To: | USPTO – Post Registration | From: | Adam J. Ezer |
|---|---|---|---|
| Fax: | (571) 273-8500 | Pages: | 1 |
| Phone: | (571) 272-9500 or 571-272-9539 | | 02/17/2006 |
| Re: | " SECURE NETWORX" 2,939,034 | | |

☑ Urgent   ☐ For Review   ☐ Please Comment   ☐ Please Reply   ☑ Please Recycle

**Attn: Post Registration**

Mr. Rodney Makel
Commissioner for Trademarks

Dear Sir:

A third party law firm King & Spalding LLP, recently filed a request that I signed for the voluntary surrender of the above captioned mark. This request was sent as part of the settlement with the Delaware Corporation Secure Networx Corp. with Secureworks Inc., of Atlanta, Georgia. I note that this request was also filed by King & Spalding in the Cancellation proceedings instituted by the Delaware company (TTAB No. 92044570). The Board stated that "Petitioner's voluntary surrender of its Registration No. 2939034 filed October 6, 2005 has been forwarded to the Post Registration Office." The Petitioner was the Delaware corporation and not the Canadian company.

It appears that the assignment of all rights to another company of the same name, incorporated in Canada, had already taken place.

I did not have the authority of the Canadian company to sign the Request. Further, no director's meeting was held on this issue by the Canadian company; nor was any consent issued or agreement concluded.

I may become personally liable to the Canadian company if the Request signed in my capacity of the Delaware Corporation that you have received is acted on by the USPTO. Further, this is a mark over which it appears the Delaware company no longer had any rights.

<u>As the sole Director of the Canadian company Secure Networx Corp. I hereby request that you not act on the request for cancellation that I duly signed as the President of the Delaware corporation of the same name.</u>

I apologize for my error. Had I known that the assignment was completed I would have advised King & Spalding accordingly.

Should you have any questions concerning this matter please contact me.

Adam Ezer

Adam J. Ezer
114-3755 West 6th Ave.
Vancouver, BC, V6R1T9
(778) 371-9182 Tel.
adamezer@gmail.com

| To: | Rodney Makel - USPTO Post Registration From: | Adam J. Ezer |
|---|---|---|
| Fax: | (571) 273-9500 | Pages: 2 |
| Phone: (571) 272-9539 | | 08/11/2006 |
| Re: | Secure Networx, 2,939,034 | |

☒ **Urgent**   ☐ For Review   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle

Dear Mr. Makel:

Further to my letter of February 17 2006 (a copy follows this letter), and our subsequent correspondence I am writing concerning the above captioned mark.

As you know, I asked for the mark to be reinstated, on the basis of my letter, and the fact that the Delaware company requesting the cancellation no longer owned the mark.

On July 25, 2006 the mark was reinstated. However, since then the mark has been cancelled again, and the reinstatement of July 25, 2006 has been deleted.

Please reinstate the mark based on my previous correspondence. Further, please make sure that the correspondence address is to me, or Secure Networx's attorney, Mr. Richard Morris Jr. in Florida. Keith Sharkin is listed as the company's attorney, when he is not and has never been the company's attorney.

If you will not have the mark reinstated forthwith please provide me with the name and fax number of the person to whom I can write about this matter.

Thank you.

Yours truly,

Adam Ezer

**Adam J. Ezer**
114-3755 West 6th Ave.
Vancouver, BC, V6R1T9
(778) 371-9182 Tel.
adamezer@gmail.com

| To: | Montia Pressey | From: | Adam J. Ezer |
|---|---|---|---|
| Fax: | 571-273-8944 | Pages: | 2 |
| Phone: | 571-272-8944 | | 08/25/2006 |
| **Re:** | **Secure Networx 2,939,034** | | |

☒ **Urgent**   ☐ For Review   ☐ Please Comment   ☐ Please Reply   ☐ Please Recycle

Dear Ms. Pressey:

Further to my conversation with Mr. Makel I understand that you have control over this file, and have decided not to reinstate the above captioned mark, or to change the correspondence information. Mr. Makel stated that you referred to the TTAB decision relating to the voluntary surrender of the mark. I have important issues that require resolution;

1. I understand that Secureworks has contacted the USPTO regarding their position that the mark not be reinstated, however no correspondence appears on your website. Please send me a copy of this correspondence.

2. Mr. Sharkin is not the lawyer for Secure Networx, and he never has been. He was the lawyer for the adverse party to the Oppositions, Secureworks. Please correct this.

3. The request for cancellation was submitted and my letters requesting that it not be acted on were sent before the mark was cancelled.

4. Furthermore, the request for cancellation submitted to the TTAB states that the registrant Delaware company was the "current owner of the entire right, title and interest in and to the above captioned service mark...". The Registrant is the Delaware company. The representation that the Registration was still the current owner of the entire right, title and interest in the mark was in error. That is why I wrote to the USPTO before the cancellation took place. The entire right, title and interest in and to the mark was transferred on July 26 2005 to the Canadian company (Reel/Frame

5. Furthermore, the "voluntary surrender" of registration was not required by the TTAB. In fact, in its correspondence dated November 28, 2005, the Board refers to the "voluntary surrender" of the mark of the Petitioner. The Petitioner, again, was the Delaware corporation and not the Canadian company of the same name.

If in fact you must;

a) Require the correspondence address to be for a lawyer of an adverse party, and not the current owner or former owner of the mark;

b) Require the cancellation of the mark to stand, based on the "voluntary surrender", requested not to be acted on before it was acted on, made by the former owner of the mark (and not the owner at the time of the request);

Then I ask that you please write to me with as detailed an explanation as possible for your actions. As the President of the Canadian company that was assigned the mark, I intend to proceed with these issues until the correspondence address and name are updated from their current erroneous statement, and mark is reinstated. In other words, we are not satisfied that typing "Review of Correspondence Complete" is a satisfactory response to my previous letters. This sole act, with the greatest of respect, indicates to me that my correspondence was clearly not properly reviewed, or acted upon.

Please reinstate the mark to the Canadian company as owner and correct the correspondence title and address to that written on this letterhead.

Yours truly,

Adam Ezer

# EXHIBIT E

# *Delaware*

### *The First State*

I, HARRIET SMITH WINDSOR, SECRETARY OF STATE OF THE STATE OF

DELAWARE, DO HEREBY CERTIFY THAT THE SAID "SECURE NETWORX

CORP.", FILED A CERTIFICATE OF AMENDMENT, CHANGING ITS NAME TO

"INTERNETTRUST FOUNDATION", THE THIRTY-FIRST DAY OF OCTOBER,

A.D. 2005, AT 4:08 O'CLOCK P.M.



3180246  8320

060794251

Harriet Smith Windsor, Secretary of State

AUTHENTICATION: 4998798

DATE: 08-25-06

# EXHIBIT F



BRITISH COLUMBIA

NUMBER: **A-53076**

COMPANY ACT

# CERTIFICATE OF REGISTRATION

*I Hereby Certify that*

**SECURE NETWORX CORP.**

has this day been registered as an extraprovincial company
under the *Company Act*

*Issued under my hand at Victoria, British Columbia*

*on October 25, 2000*



JOHN S. POWELL
*Registrar of Companies*
PROVINCE OF BRITISH COLUMBIA
CANADA

REEL: 003128 FRAME: 0466

RECORDED: 07/26/2005



July 26, 2005

### Assignment of All Rights and Goodwill to the mark SECURE NETWORX

This contract shall effect the transfer of all property rights, title, interest and goodwill in the mark SECURE NETWORX (Registration No. 2939034 at the United States Patent and Trademark Office on the Principal Register) from Secure Networx Corp., a Delaware Corporation to Secure Networx Corp. the British Columbia registered extraprovincial company.

Adam Ezer
President
Secure Networx Corp.

REEL: 003128 FRAME: 0465



**UNITED STATES DEPARTMENT OF COMMERCE**
**Patent and Trademark Office**
ASSISTANT SECRETARY AND COMMISSIONER
OF PATENTS AND TRADEMARKS
Washington, D.C. 20231



*900029008A*

JULY 27, 2005

PTAS

ADAM J. EZER
114-3755 WEST 6TH AVE.
VANCOUVER, V6R1T9 CANADA


                    UNITED STATES PATENT AND TRADEMARK OFFICE
                    NOTICE OF RECORDATION OF ASSIGNMENT DOCUMENT

THE ENCLOSED DOCUMENT HAS BEEN RECORDED BY THE ASSIGNMENT DIVISION OF
THE U.S. PATENT AND TRADEMARK OFFICE. A COMPLETE MICROFILM COPY IS
AVAILABLE AT THE ASSIGNMENT SEARCH ROOM ON THE REEL AND FRAME NUMBER
REFERENCED BELOW.

PLEASE REVIEW ALL INFORMATION CONTAINED ON THIS NOTICE. THE
INFORMATION CONTAINED ON THIS RECORDATION NOTICE REFLECTS THE DATA
PRESENT IN THE PATENT AND TRADEMARK ASSIGNMENT SYSTEM. IF YOU SHOULD
FIND ANY ERRORS OR HAVE QUESTIONS CONCERNING THIS NOTICE, YOU MAY
CONTACT THE EMPLOYEE WHOSE NAME APPEARS ON THIS NOTICE AT 703-308-9723.
PLEASE SEND REQUEST FOR CORRECTION TO: U.S. PATENT AND TRADEMARK OFFICE,
MAIL STOP: ASSIGNMENT SERVICES DIVISION, P.O. BOX 1450, ALEXANDRIA, VA 22313.


RECORDATION DATE: 07/26/2005          REEL/FRAME: 003128/0463
                                      NUMBER OF PAGES: 4

BRIEF: ASSIGNS THE ENTIRE INTEREST AND THE GOODWILL

ASSIGNOR:
    SECURE NETWORX CORP.              DOC DATE: 07/26/2005
                                      CITIZENSHIP: DELAWARE
                                      ENTITY: CORPORATION

ASSIGNEE:
    SECURE NETWORX CORP.              CITIZENSHIP: CANADA
    AKA INTERNETTRUST.COM             ENTITY: COMPANY
    114-3755 WEST 6TH AVE.
    VANCOUVER, BRITISH COLUMBIA V6R1T9

APPLICATION NUMBER: 76135538          FILING DATE: 09/25/2000
REGISTRATION NUMBER: 2939034          ISSUE DATE: 04/12/2005

MARK: SECURE NETWORX
DRAWING TYPE: WORDS, LETTERS, OR NUMBERS IN TYPED FORM

003128/0463 PAGE 2


ASSIGNMENT DIVISION
OFFICE OF PUBLIC RECORDS

## TRADEMARK ASSIGNMENT

.ectronic Version v1.1
Stylesheet Version v1.1

**07/26/2005**
**900029008**

| SUBMISSION TYPE: | NEW ASSIGNMENT |
|---|---|
| NATURE OF CONVEYANCE: | ASSIGNS THE ENTIRE INTEREST AND THE GOODWILL |

### CONVEYING PARTY DATA

| Name | Formerly | Execution Date | Entity Type |
|---|---|---|---|
| Secure Networx Corp. | | 07/26/2005 | CORPORATION: DELAWARE |

### RECEIVING PARTY DATA

| | |
|---|---|
| Name: | SECURE NETWORX CORP. |
| Also Known As: | AKA Internettrust.com |
| Street Address: | 114-3755 West 6th Ave. |
| City: | Vancouver |
| State/Country: | BRITISH COLUMBIA |
| Postal Code: | V6R1T9 |
| Entity Type: | COMPANY: CANADA |

### PROPERTY NUMBERS  Total: 1

| Property Type | Number | Word Mark |
|---|---|---|
| Registration Number: | 2939034 | SECURE NETWORX |

### CORRESPONDENCE DATA

Fax Number:          (514)370-8367
*Correspondence will be sent via US Mail when the fax attempt is unsuccessful.*
Phone:               778-371-9182
Email:               adamezer@hotmail.com, trademarkoppositions@hotmail.com
Correspondent Name:  Adam J. Ezer
Address Line 1:      114-3755 West 6th Ave.
Address Line 4:      Vancouver, CANADA   V6R1T9

| NAME OF SUBMITTER: | Adam J. Ezer |
|---|---|
| Signature: | /AJE/ |
| Date: | 07/26/2005 |

Total Attachments: 2

REEL: 003128 FRAME: 0463

source=ASSIGNSNTOBC#page1.tif
source=ASSIGNSNTOBC#page2.tif

REEL: 003128 FRAME: 0464

# EXHIBIT G

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| SECUREWORKS, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | )     C.A. No. 05-538(JJF) |
| v. | ) |
| | ) |
| INTERNETTRUST FOUNDATION | ) |
| f/k/a SECURE NETWORX CORP., | ) |
| | ) |
| Defendant. | ) |

### DECLARATION OF JILL WASSERMAN

I, Jill Wasserman, declare as follows:

      1.      I am an attorney with the law firm of King & Spalding LLP, which represents Plaintiff SecureWorks, Inc. in the above-captioned matter. I submit this declaration in support of Plaintiff's Motion For Contempt, Sanctions, And To Enforce The Judgment On Consent ("Motion For Contempt"). I have personal knowledge of the facts set forth in this declaration. I am over eighteen years of age and am competent to testify as to all matters herein.

      2.      Attached to this Declaration as Appendix 1 are true and accurate copies of e-mail correspondence from Wayne B. Warren, an attorney with the law firm of Gowling Lafleur Henderson LLP in Ottawa, Ontario, Canada reflecting the results of several searches of Canadian corporations records, the most recent of which was conducted in May, 2006 and including Mr. Warren's explanation of the meaning of the term "extraprovincial license" under Canadian corporate law.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this August _28th_, 2006, at Atlanta, Georgia.

Jill Wasserman

# EXHIBIT 1

**From:**      Warren, Wayne [Wayne.Warren@gowlings.com]
**Sent:**      Thursday, May 11, 2006 6:22 PM
**To:**        Wasserman, Jill
**Subject:**   FW: SecureWorks, Inc. v. Secure Networx Corp. -

**Attachments:**   Secure Networks.pdf; Secure Networx.pdf; Secure Works.pdf; SecureNetworks.pdf

      

Secure              Secure              Secure Works.pdf  SecureNetworks.pd
etworks.pdf (113 KBetworx.pdf (107 KB    (103 KB)         f (102 KB)
                                                                    Jill, we ran searches on May
3 and updated them today. The searches do not reveal any new information.
Just let us know if you wish to run further searches in future.

Best regards

Wayne

Wayne B. Warren
Gowling Lafleur Henderson LLP
Suite 2600, 160 Elgin Street
Ottawa, Ontario
K1P 1C3

Tel:  (613) 786-0191
Fax: (613) 788-3481
E-mail:  wayne.warren@gowlings.com

-----Original Message-----
From: Richardson, Judy [mailto:Judy.Richardson@gowlings.com] On Behalf Of
Warren, Wayne
Sent: Friday, August 5, 2005 12:09 PM
To: Curtin, Thomas
Cc: Mulock, Frank; Hung, Mabel
Subject: SecureWorks, Inc. v. Secure Networx Corp. -


Thomas:

Thank you for forwarding to us a copy of the assignment documents filed by
Adam Ezer.  Attached to this note are two (2) memoranda prepared by our
Corporate Searcher Mabel Hung.  Based upon all of the information available to
us and all of the searches we have undertaken it would appear that Mr. Ezer
purported to have a company assign certain rights to itself, that is, our
search results do not show that a separate corporation has been created.

If in the future further information becomes available to you let us know and
we will conduct appropriate searches.

Best regards,

Wayne

Wayne B. Warren
Gowling Lafleur Henderson LLP
Suite 2600, 160 Elgin Street
Ottawa, Ontario K1P 1C3
Tel: (613) 786-0191
Fax: (613) 788-3481
E-mail: wayne.warren@gowlings.com


IMPORTANT NOTICE:  This message is intended only for the use of the individual
or entity to which it is addressed. The message may contain information that
is privileged, confidential and exempt from disclosure under applicable law.
If the reader of this message is not the intended recipient, or the employee
or agent responsible for delivering the message to the intended recipient, you
are notified that any dissemination, distribution or copying of this
communication is strictly prohibited.  If you have received this communication
in error, please notify Gowlings immediately by email at
postmaster@gowlings.com.  Thank you.

1

Gowling Lafleur Henderson LLP  |  Barristers & Solicitors  |  Patent & Trade Mark Agents  |



Suite 2600
160 Elgin Street
Ottawa, Ontario
Canada K1P 1C3
Telephone (613) 233-1781
Facsimile (613) 563-9869
www.gowlings.com

# Memorandum

**Mabel Hung**
Direct (613) 786-8692
Direct Fax (613) 788-3569
mabel.hung@gowlings.com

To: Wayne Warren

Date: August 3, 2005

Re: SECURE NETWORX CORP.

File Number: 06677384GEN

---

With respect to the referenced corporation, enclosed please find the following searches conducted in British Columbia by our agent:

## CORPORATE SEARCHES

The agent conducted a preliminary search against Secure Networx Corp. and Internettrust.com in the databases maintained by the corporate registry of British Columbia through for the active and inactive corporations and business style registrations.

I advise that the agent located Secure Networx Corp., the extra-provincial registration, which I found for you on July 28, 2005.

Enclosed are copies of the preliminary search reports for your review.

## UNCERTIFIED PPSA

Uncertified PPSA searches were conducted against the following names:

- Secure Networx Corp.
- Secure Networx Inc.
- Secure Networx
- Internettrust.com
- Ezer

I advise that a registration was found for Secure Networx Corp.  No registrations were found for the other names.

Gowling Lafleur Henderson LLP   |   Barristers & Solicitors   |   Patent & Trade Mark Agents   |

Page 2

## COPIES OF DOCUMENTS

Copies of documents were obtained from the corporate registry in British Columbia with respect to Secure Networx Corp. and they are as follows:

- Certificate of Incorporation filed with the State of Delaware, dated February 22, 2000

- A document for the State of Delaware Office of the Secretary of State, sworn and signed on April 13, 2000 certifying that the certificate of incorporation, dated February 22, 2000 is a true copy.

- Bylaws of Secure Networx Corp., dated March 1, 2000

- A document for The Registrar of Companies in Victoria, British Columbia, sworn and signed on March 1, 2000 certifying that the bylaws, dated March 1, 2000 is as true copy.

- Certificate of Registration for the extra-provincial registration of Secure Networx Corp., filed with the Registrar of Companies in British Columbia on October 25, 2000.

- State of Registration for Extra-Provincial Company in British Columbia filed on October 25, 2000.

- Change of Head Office filed with the Ministry of Finance in British Columbia on November 16, 2000.

- Notice of Change of Attorney filed on December 13, 2001.

- Notice of Commence of Cancellation issued by the Ministry of Finance in British Columbia, dated December 24, 2003 for annual returns not filed since date of registration on October 25, 2000.

I trust the foregoing is fully satisfactory. Should you require anything further, please advise.

/mh
encl.

F:\CORP\PREC\Search Results\s\Secure Networx Corp\Memo on further searches in BC.doc

-----Original Message-----
From: Richardson, Judy [mailto:Judy.Richardson@gowlings.com] On Behalf Of
Warren, Wayne
Sent: Friday, July 29, 2005 2:56 PM
To: Curtin, Thomas
Cc: Mulock, Frank; Hung, Mabel
Subject: SecureWorks, Inc. v. Secure Networx Corp. - Your Ref.: 07609.104003


Frank also wanted me to advise you that an extra-provincial license does not
mean that a separate corporation has been created.  It simply indicates that a
foreign corporation has obtained a license to conduct business in the
province.

With respect to future corporate searches to determine if a new corporation
has been created, do we have any indication that the other side may have
incorporated in another Canadian jurisdiction (i.e. another province or
federally)?  If we have any such evidence, it may be prudent to do searches in
other jurisdictions.

Best regards.

Wayne

Wayne B. Warren
Gowling Lafleur Henderson LLP

3

# EXHIBIT H

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| Registrant | : | SECURE NETWORX CORP. a/k/a INTERNETTRUST.COM |
| Serial No. | : | 76/135,538 |
| Filing Date | : | September 25, 2000 |
| Registration No. | : | 2,939,034 |
| Registration Date | : | April 12, 2005 |
| Mark | : | SECURE NETWORX |

## APPLICATION TO SURRENDER REGISTRATION FOR CANCELLATION

Commissioner for Trademarks
P.O. Box 1451
Alexandria, VA 22313-1451

To the Commissioner for Trademarks:

Secure Networx Corp. a/k/a Internettrust.com ("Secure Networx Corp.") is the registrant and current owner of the entire right, title and interest in and to the above-captioned service mark registration, together with the goodwill of the business symbolized by and associated with that mark.

Secure Networx Corp. voluntarily surrenders for cancellation with prejudice U.S. Registration No. 2,939,034 for the mark SECURE NETWORX, covering "providing computer related security and privacy services, namely, installing and monitoring firewalls, anti-virus protection, digital certificates, encryption and privacy tools, virtual private networks, biometric authentication, intrusion detection and network monitoring, analysis and recovery for use on a

global network of computers, wired and wireless networks, telecommunication networks and electronic media" in International Class 42.

The original certificate of registration issued by the United States Patent and Trademark Office is attached hereto.

Respectfully submitted,

SECURE NETWORX CORP.
  a/k/a INTERNETTRUST.COM
114-3755 West 6th Avenue
Vancouver, BC V6R1T9
Canada

By: _____

Name: _Adam Ezel_

Title: _President_

Date: _Oct. 5 2005_

# EXHIBIT I

Thank you for your request. Here are the latest results from the TARR web server.

This page was generated by the TARR system on 2006-08-24 18:03:20 ET

**Serial Number:** 76135538 Assignment Information

**Registration Number:** 2939034

**Mark (words only):** SECURE NETWORX

**Standard Character claim:** No

**Current Status:** Registration canceled under Section 7.

**Date of Status:** 2006-07-25

**Filing Date:** 2000-09-25

**Transformed into a National Application:** No

**Registration Date:** 2005-04-12

**Register:** Principal

**Law Office Assigned:** LAW OFFICE 106

   you are the applicant or applicant's attorney and have questions about this file, please contact the Trademark Assistance Center at TrademarkAssistanceCenter@uspto.gov

**Current Location:** 830 -Post Registration

**Date In Location:** 2006-07-25

---

## LAST APPLICANT(S)/OWNER(S) OF RECORD

---

1. SECURE NETWORX CORP.

**Address:**
SECURE NETWORX CORP.
114-3755 WEST 6TH AVE.
VANCOUVER, BC V6R1T9
Canada
**Legal Entity Type:** Company
**State or Country Where Organized:** Canada

---

## GOODS AND/OR SERVICES

---

**International Class:** 042
**Class Status:** Section 7(D) - Cancelled
Providing computer related security and privacy services, namely, installing and monitoring firewalls, anti-virus protection, digital certificates, encryption and privacy tools, virtual private networks, biometric authentication, intrusion detection and network monitoring, analysis and recovery for use on a global network of computers,

wired and wireless networks, telecommunication networks and electronic media
**Basis:** 1(a)
**First Use Date:** 2000-03-11
First Use in Commerce Date: 2000-05-19

---

## ADDITIONAL INFORMATION

---

**Disclaimer:** "SECURE"

---

## MADRID PROTOCOL INFORMATION

---

(NOT AVAILABLE)

---

## PROSECUTION HISTORY

---

2006-08-15 - Review Of Correspondence Complete

2006-08-11 - FAX RECEIVED

2006-05-11 - Canceled Section 7 - total surrender

2006-05-11 - Assigned To LIE

2006-02-17 - FAX RECEIVED

2005-11-25 - PAPER RECEIVED

2005-04-12 - Registered - Principal Register

2004-10-08 - Opposition terminated for Proceeding

2004-10-08 - Opposition terminated for Proceeding

2004-10-08 - Opposition dismissed for Proceeding

2002-09-23 - Opposition instituted for Proceeding

2002-08-07 - Opposition papers filed

2002-06-25 - Published for opposition

2002-06-05 - Notice of publication

2002-01-17 - Approved for Pub - Principal Register (Initial exam)

2001-09-05 - Communication received from applicant

2001-03-14 - Non-final action mailed

2001-03-06 - Assigned To Examiner

## CORRESPONDENCE INFORMATION

**Correspondent**
KEITH E. SHARKIN (Attorney of record)

KEITH E. SHARKIN
KING & SPALDING LLP
191 PEACHTREE STREET, N.E.
ATLANTA, GA 30303-1763


**Domestic Representative**
Keith E. Sharkin

# EXHIBIT J

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| SECUREWORKS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 05-538(JJF) |
| v. | ) | |
| | ) | |
| INTERNETTRUST FOUNDATION | ) | |
| f/k/a SECURE NETWORX CORP., | ) | |
| | ) | |
| Defendant. | ) | |

## DECLARATION OF KEITH E. SHARKIN

I, Keith E. Sharkin, declare as follows:

1.      I am a partner with the law firm of King & Spalding LLP, which represents Plaintiff SecureWorks, Inc. in the above-captioned action. I submit this declaration in support of Plaintiff's Motion For Contempt, Sanctions, And To Enforce The Judgment On Consent ("Motion For Contempt"). I have personal knowledge of the facts set forth in this declaration. I am over eighteen years of age and am competent to testify as to the matters herein.

2.      On or about July 29, 2006, I received an e-mail from Adam Ezer advising me that he would be contacting the United States Patent and Trademark Office ("USPTO") to request reinstatement of Registration No. 2,939,034 for the mark SECURE NETWORX. A copy of the July 29, 2006 e-mail is attached hereto as Exhibit B. This registration had previously been cancelled pursuant to the Settlement Agreement and Judgment on Consent entered in this case.

3.      Shortly after receiving the July 29, 2006 e-mail, I searched the USPTO's online trademark records database and discovered that the SECURE NETWORX registration had been reinstated.

4.    Within the next few days, I spoke with Mr. Rodney Makel of the Post-Registration Section of the USPTO to inquire about the reason for the SECURE NETWORX registration being re-instated and was told he would look into it.

5.    Within a day or two after my telephone conversation with Mr. Makel, the online records of the USPTO showed that the SECURE NETWORX registration had again been cancelled.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this August _____ 25th _____, 2006, at New York, New York.

_____
Keith E. Sharkin

2

# EXHIBIT K

LEXSEE 1993 USDIST LEXIS 7850

**MARTIN HARRIS, et al., Plaintiffs, v. THEODORE LEVINE, et al., Defendants.**

**CIVIL ACTION NO. 82-1847**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

*1993 U.S. Dist. LEXIS 7850*

**June 14, 1993, Decided**
**June 14, 1993, Filed**

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In a class action seeking relief for allegedly unconstitutional prison overcrowding, plaintiff inmates, present and future, incarcerated in the Philadelphia prison system, moved for contempt sanctions against defendant City of Philadelphia and various city officials, for failure to comply with a stipulation and agreement, which revised and replaced an earlier consent decree.

**OVERVIEW:** The stipulation and agreement provided for long-term solutions to overcrowding in Philadelphia prisons. These included construction of a 1000-bed prison in Northeast Philadelphia, and development of a comprehensive planning process for prison population, control, and management. The stipulation and agreement also addressed short-term solutions; these included expanded capacity and early release procedures. The maximum allowable population for the prison system was continued at 3750 inmates, as established in the consent decree. During periods when the MAP was exceeded, the stipulation and agreement mandated the use of an early release mechanism for pretrial detainees. The plaintiff class moved for imposition of sanctions for the city's alleged contempt of this provision. The court found the city failed to comply with procedures in the stipulation and agreement whereby the parties might propose changes. Inter alia, the city was in contempt for its unilateral decisions to modify the release mechanism with respect to detainees with "other holds," and to modify the release mechanism with respect to detainees deemed a danger to themselves or the community.

**OUTCOME:** The court granted plaintiffs' motion for contempt sanctions against defendants. The court adjudged the City of Philadelphia in contempt of the order, and assessed a fine against the city as compensation to the plaintiff class for past disobedience to the order and to compel future compliance. The court permitted the city to submit to a special master, an alternative plan in accordance with the stipulation and agreement.

**LexisNexis(R) Headnotes**

*Civil Procedure > Judgments > Entry of Judgments > Enforcement & Execution > General Overview*
*Civil Procedure > Sanctions > Contempt > Civil Contempt*
*Governments > Courts > Authority to Adjudicate*
[HN1] The court has the power to enforce an order, including a consent decree, if it is determined that a party is in contempt. The power to punish for contempt is inherent in all courts; its existence is essential to the preservation of order in judicial proceedings, and to the enforcement of the judgments, orders and writs of the courts and, consequently, to the due administration of justice. Liability for civil contempt attaches when a person violates a court order of which there is actual notice. The proponent in a contempt proceeding must demonstrate that respondent's conduct constitutes contempt. Proof of the violation must be clear and convincing, but no finding of willfulness is necessary. A finding of contempt is not precluded because the acts were done in good faith. Bad faith violations of a court order provide a sound basis for a finding of contempt. The court's civil contempt power is discretionary, and where there is ground to doubt the wrongfulness of respondent's conduct, there should be no finding of contempt. Ambiguities in an order redound to the benefit of the person charged with contempt.

*Civil Procedure > Remedies > Injunctions > Contempt*

1993 U.S. Dist. LEXIS 7850, *

Civil Procedure > Sanctions > Contempt > General Overview
[HN2] A court finding contempt by a wilful violation of a court order may order the offending party to pay the attorney's fees necessitated by the movant's efforts to enforce the order.

Civil Procedure > Judgments > Entry of Judgments > Consent Decrees
[HN3] A consent decree is both a judicial act and also a voluntary contractual one. A party to a consent decree, having made a free, calculated and deliberate choice to submit to an agreed upon decree rather than seek a more favorable litigated judgment, bears a burden which is perhaps even more formidable than had they litigated and lost.

Civil Procedure > Judgments > Entry of Judgments > Consent Decrees
Contracts Law > Contract Interpretation > General Overview
[HN4] Because consent decrees and orders have many of the attributes of ordinary contracts, they should be construed basically as contracts. However, it is of paramount importance in enforcing a consent decree to construe it as to give effect to the intention of the court, not to that of the parties. The court should discount an interpretation which would do injustice to the overall tenor of the order, or would render meaningless a specific provision.

Civil Procedure > Settlements > General Overview
Civil Procedure > Judgments > Entry of Judgments > Consent Decrees
Contracts Law > Types of Contracts > Settlement Agreements
[HN5] A consent decree is essentially a settlement agreement subject to continued judicial policing.

Civil Procedure > Sanctions > Contempt > Civil Contempt
[HN6] Determining sanctions for civil contempt is committed to the sound discretion of the trial court.

Civil Procedure > Sanctions > Contempt > Civil Contempt
[HN7] In civil contempt cases, compensatory sanctions must not exceed the actual loss suffered by the party that was wronged.

JUDGES: [*1] SHAPIRO

OPINIONBY: NORMA L. SHAPIRO

OPINION:

MEMORANDUM AND ORDER

NORMA L. SHAPIRO, J.

JUNE 14, 1993

The plaintiff class in this prison overcrowding action filed a "Motion for Contempt Sanctions Against Defendants for Failure to Comply With the Court's Order of March 11, 1991." The City filed its Response in Opposition, and the District Attorney filed Objections in the Nature of a Response to Parties' Positions on Contempt Sanctions. n1 The parties submitted Stipulated Facts, and the court also heard argument.

n1 The District Attorney has twice moved to intervene in this case; both motions were denied by this court, and those denials were affirmed on appeal. See *Harris v. Pernsley, 113 F.R.D. 615 (E.D. Pa. 1986)* (denying motion for intervenor status), aff'd *820 F.2d 592 (3d Cir. 1987),* cert. denied, *484 U.S. 947 (1987);* Harris v. Reeves, Order of January 14, 1991 (denying renewed motion for intervenor status), aff'd *946 F.2d 214 (3d Cir. 1991),* cert. denied sub nom., *Abraham v. Harris, 117 L. Ed. 2d 652, 112 S. Ct. 1516 (1992).* While the District Attorney is not a party to this case, the court has granted objector status to the District Attorney with regard to the release orders at issue here. See *Harris v. Pernsley, 113 F.R.D. at 625.* The conduct of the District Attorney is peculiarly relevant to the contempt determination, and "those who have knowledge of a valid court order and abet others in violating it are subject to the court's contempt powers." *Roe v. Operation Rescue, 919 F.2d 857, 871 (3d Cir. 1990).* As the City defendants acknowledge responsibility for the conduct alleged to be in contempt of this court's Order, and the plaintiff class has not moved for sanctions against the District Attorney, we do not address that question. (See Tr. 12/18/93, at 135 - 40).

[*2]

I. BACKGROUND.

This action, seeking relief for allegedly unconstitutional prison overcrowding, was filed in 1982. The plaintiff class consists of inmates, present and future, incarcerated in the Philadelphia prison system. Defendants are

the City of Philadelphia and various City officials. An initial Settlement Agreement was approved and entered as a Consent Decree on December 30, 1986. See *Harris v. Pernsley*, 654 F. Supp. 1042 (E.D. Pa. 1987). The court approved a new Stipulation and Agreement, revising and replacing the earlier Consent Decree in part, on March 11, 1991. See *Harris v. Reeves*, 761 F. Supp. 382 (E.D. Pa. 1991). n2

> n2 The history of this case, and the provisions of the 1991 Stipulation and Agreement, are fully discussed in *Harris v. Reeves*, 761 F. Supp. 382.

The Stipulation and Agreement provides for long-term solutions to overcrowding in Philadelphia prisons. These include construction of a 1000-bed [*3] prison in Northeast Philadelphia, and development of a comprehensive planning process for prison population, control, and management.

The Stipulation and Agreement also addresses short-term solutions; these include expanded capacity and early release procedures. The Maximum Allowable Population ("MAP") for the prison system was continued at 3750 inmates, as established in the Consent Decree. During periods when the MAP is exceeded, the Stipulation and Agreement mandates the use of an Early Release Mechanism for pretrial detainee. The plaintiff class moves for imposition of sanctions for the City's alleged contempt of this provision.

The parties' Stipulations of Fact are adopted by the court and are of record in this action at Docket No. 853.

II. DISCUSSION.

A. THE EARLY RELEASE MECHANISM. The Early Release Mechanism was established by Order of April 18, 1989. Paragraph 17 of the Stipulation and Agreement revises that Order and other intervening Orders. Under the Early Release Mechanism of P 17, the City is required to designate inmates who meet specified release conditions; a list of their names and other relevant information is submitted to the Special Master, who determines [*4] whether the inmates are eligible for release under the terms of the Stipulation and Agreement and, if so, orders their release. The City is required to "submit no fewer than thirty-five (35) names per day, at least five (5) days per week [or, 175 names per week], whenever the population is in excess of 3,750." Stipulation and Agreement P17(b). n3 Since the Consent Decree was entered, the MAP has been exceeded continuously, except for a brief period in 1988. n4

> n3 The District Attorney, objecting to the Early Release Mechanism, filed an appeal of this court's Order of March 11, 1991. Because the Court of Appeals affirmed this court's earlier Order denying intervenor status to the District Attorney, the District Attorney's appeal was dismissed. *Harris v. Reeves*, 946 F.2d at 224. Pending that determination the Court of Appeals temporarily stayed the Early Release Mechanism. Therefore, it was not actually implemented until November, 1991.

> n4 The City was in compliance with the MAP on 53 days between June and September, 1988. "The release mechanism to which the District Attorney has expressed such vehement opposition has been made necessary by the City's inability to reduce the prison population below the MAP." *Harris v. Reeves*, 761 F. Supp. at 396.

[*5]

The criteria for listing pretrial detainees are set forth in P 17(a) of the Stipulation and Agreement:

> a. Defendants shall designate and submit to the Special Master the names of inmates who meet the criteria of Paragraph 4.E. (1) - (3) of the September 21, 1990, Order which provides for the release of:

>> (1) all persons admitted to the prisons under prior orders of the court who are still detained but who would not be admitted under the provisions of this order as now modified;

>> (2) prisoners held in default of the lowest amount of percentage bail as necessary to reduce the population in all institutions to the maximum allowable populations. If inmates considered for release under this paragraph are held in default of equal amounts of bail, preference shall be given to the inmate held the longest time. Persons charges with offenses enumerated in paragraph 3A and B [of the September 21, 1990, Order] shall not be released pursuant to this paragraph.

The September 21, 1990, Order referred to in P 17(a) of the Stipulation and Agreement states at P 4.E.:

1993 U.S. Dist. LEXIS 7850, *

E. Release categories shall be:

(1) a person admitted to prison under prior orders of the court who is still [*6] detained but who would not be admitted under this order as now modified;

(2) a prisoner held in default of the lowest amount of percentage bail as necessary to reduce the population in all institutions to the maximum allowable. If inmates considered for release under this paragraph are held in default of equal amounts of bail, preference shall be given to the inmate held the longest time.

(3) a person charged with offenses enumerated in paragraphs 3A and B shall not be released pursuant to this paragraph. n5

n5 Paragraphs 3A and B list the so-called "enumerated offenses," which are: murder, attempted murder, forcible rape, attempted rape, involuntary deviate sexual intercourse, corrupting the morals of a minor, arson, kidnapping, aggravated assault, a crime of violence committed or attempted with a firearm, knife or explosive, escape from custody, and certain domestic violence and abuse offenses set forth at *18 Pa. Cons. Stat. Ann. § § 2711, 4952, 4955; 35 Pa. Cons. Stat. Ann. § 10190.*

The court explained [*7] how the Early Release Mechanism was to function in its Memorandum of March 26, 1991, *Harris v. Reeves, 761 F. Supp. at 391 - 92:*

The early release mechanism for pretrial detainees, originally established by Order of April [18], 1989, is revised. The City must now submit to the Special Master names of 35 pretrial detainee per day, five days per week, whenever the overall MAP is exceeded. ([para.] 17(b)). The criteria cover those in custody who no longer would be admissible and those in custody

on the lowest amount of bail for the longest time not charged with murder, attempted murder, forcible rape, attempted rape, involuntary deviate sexual intercourse, corrupting the morals of a minor, arson, kidnapping, aggravated assault, a crime of violence committed or attempted with a firearm, knife or explosive, escape or domestic violence and abuse. ([para.] 17(a)).

Names will be provided concurrently to the District Attorney who will have 72 hours to object in writing. ([para.] 17(d)). The District Attorney may object if there have been errors in the application of the release criteria or for the considerations of public safety. The Special Master [*8] will direct the release of pretrial detainee meeting the court's formulated criteria. ([para.] 17(e)). If the District Attorney objects to a particular release for public safety considerations, that inmate will not be released if the District Attorney designates the name of another eligible pretrial detainee, not already submitted. The Special Master's findings of fact will be final. . . . Defendants must comply with a release order within 24 hours of receiving it. ([para.] 17(f)). Finally, if the court or the Special Master is unavailable, the court will designate a judicial officer to review the names submitted by the [Population Management Unit]. ([para.] 17(g)).

The City may formulate and submit to the court other criteria and procedures for release of inmates as a possible alternative or concurrent mechanism with that provided in Paragraph 17. ([para.] 30).

The Early Release Mechanism superseded the procedures in PP 4A-C of the court's Order of September 21, 1990. *Harris v. Reeves, 761 F. Supp. at 392 n 1.* "Otherwise, [the] Stipulation and Agreement [does] not affect the operation of the September 21, 1990 Order . . . ." Stipulation and [*9] Agreement P 18.

For the 15 week period ending the week of June 29, 1992, the defendants submitted 175 names per week to the Special Master. Beginning the week of July 6, 1992, defendants submitted fewer than 175 names per week. According to the 38th Report of the Special Master, the

1993 U.S. Dist. LEXIS 7850, *

numbers submitted for the weeks noted were (see also     Stipulation Nos. 42, 69):

| July | 6 | 122 |
|------|----|-----|
|      | 13 | 166 |
|      | 20 | 154 |
|      | 27 | 161 |

| August | 3 | 173 |
|--------|----|-----|
|        | 10 | 68 |
|        | 17 | 82 |
|        | 24 | 45 |
|        | 31 | 101 |
| September | 7 | 67 |
|           | 14 | 60 |
|           | 21 | 86 |
|           | 28 | 70 |

Similarly, the 39th Report of the Special Master noted the following numbers submitted for the weeks shown (see also Stipulation Nos. 42, 79, 80):

| October | 5 | 75 |
|---------|----|-----|
|         | 12 | 76 |
|         | 19 | 67 |
|         | 26 | 35 |
| November | 2 | 75 |
|          | 9 | 75 |
|          | 16 | 77 |
|          | 23 | 71 |
|          | 30 | 54 |

The MAP was exceeded at all times during this period. (Stipulation Nos. 46, 78, 79). The plaintiff class moves this court to hold the City in contempt for failure to list 175 names per week during this period. n6

n6 Plaintiff class suggests that if this court finds defendants in contempt, fines should be imposed for the period from July 6, 1992, through the date of this Order. For reasons subsequently stated, any monetary sanctions will be imposed

only for the period from the week of July 6, 1992, until the week of November 30, 1992.

[*10]

**B. LEGAL STANDARD**. [HN1] This court has the power to enforce an order, including a consent decree, if it is determined that a party is in contempt. See, e.g., *Interdynamics, Inc. v. Firma Wolf, 653 F.2d 93, 97 (3d Cir. 1981)* (party found in contempt for violation of consent decree), cert. denied, *454 U.S. 1092 (1981)*. "The power to punish for contempt is inherent in all courts; its existence is essential to the preservation of order in judi-

cial proceedings, and to the enforcement of the judgments, orders and writs of the courts and, consequently, to the due administration of justice." *Ex parte Robinson, 86 U.S. 505, 19 Wall. (86 US) 505, 510, 22 L. Ed. 205 (1874).* Liability for civil contempt attaches when a person violates a court order of which there is actual notice. See *Quinter v. Volkswagen of America, 676 F.2d 969, 972 (3d Cir. 1982).* The proponent in a contempt proceeding must demonstrate that respondent's conduct constitutes contempt. See *id. at 969.* Proof of the violation must be clear and convincing, but no finding of wilfulness is necessary. [*11] See 11 Charles Wright & Arthur Miller, Federal Practice & Procedure § 2960, at 591 - 92 (1973); *Fox v. Capital Co. 96 F.2d 684, 686 (3d Cir. 1938).* See also *Quinter, 676 F.2d at 973* ("'It is not necessary that . . . there be intent to violate the court order.'"). n7 A finding of contempt is not precluded because the acts were done in good faith. See *Thompson v. Johnson, 410 F. Supp. 633, 640 (E.D. Pa. 1976),* aff'd, *556 F.2d 568 (3d Cir. 1977).* Bad faith violations of a court order provide a sound basis for a finding of contempt. See, e.g., *Hutto v. Finney, 437 U.S. 678, 57 L. Ed. 2d 522, 98 S. Ct. 2565 (1978)* (sanction for bad faith equated with contempt sanction). The court's civil contempt power is discretionary, and where there is ground to doubt the wrongfulness of respondent's conduct, there should be no finding of contempt. See *Littlejohn v. Bic Corp., 851 F.2d 673, 686 (3d Cir. 1988); Quinter, 676 F.2d at 974.* Ambiguities in an order "redound to the benefit of the person charged with [*12] contempt." *Ford Motor Co. v. Summit Motor Products, 930 F.2d 277, 286 (3d Cir. 1991),* cert. denied, *112 S. Ct. 373.*

[HN2] n7 A court finding contempt by a wilful violation of a court order may order the offending party to pay the attorney's fees necessitated by the movant's efforts to enforce the Order. See *Ranco Ind. Products v. Dunlap, 776 F.2d 1135, 1139 (3d Cir. 1985)*

[HN3] A consent decree is both a judicial act and also a voluntary contractual one. See *United States v. Wheeling-Pittsburgh Steel Corp., 818 F.2d 1077, 1088 (3d Cir. 1987).* "[A] party to a consent decree, having made a 'free, calculated and deliberate choice to submit to an agreed upon decree rather than seek a more favorable litigated judgment,' bears a burden which is 'perhaps even more formidable than had they litigated and lost.'" Id. (quoting *United States Steel Corp. v. Fraternal Ass'n of Steel Haulers, 601 F.2d 1269, 1274 (3d Cir. 1979)*). [*13]

[HN4] Because "consent decrees and orders have many of the attributes of ordinary contracts, they should be construed basically as contracts." *United States v. ITT Continental Baking Co., 420 U.S. 223, 236, 95 S. Ct. 926, 43 L. Ed. 2d 148 (1975)* However, it is of paramount importance in enforcing a consent decree "to construe [it] as to give effect to the intention of the court, not to that of the parties." *Ford Motor Co., 930 F.2d at 286* (citation omitted). The court should discount an interpretation which would "do injustice to the overall tenor of the order," or would "render meaningless a specific provision." *Id. at 287.* This court's opinion stating its decision to adopt the Stipulation and Agreement as an Order of this court is particularly relevant to the determination of whether defendants' conduct was in contempt of said Order. See *Harris v. Reeves, 761 F. Supp. 382 (E.D. Pa. 1991).*

The court also rejects the District Attorney's argument that the court may not consider "what PMU's practice used to be" prior to the events underlying this Motion. (Vandenbraak, Tr. 12/18/93, at 159). [HN5] "A consent [*14] decree is essentially a settlement agreement subject to continued judicial policing." *Williams v. Vukovich, 720 F.2d 909, 920 (6th Cir. 1983),* quoted in *Halderman by Halderman v. Pennhurst State School & Hosp., 901 F.2d 311, 318 (3d Cir. 1990),* cert. denied, *498 U.S. 850, 112 L. Ed. 2d 107, 111 S. Ct. 140 (1990).*

**C. CONTEMPT DETERMINATION.** In a memorandum dated August 5, 1992 ("Memorandum, 8/5/92," Stipulations Ex. H), from James B. Jordan, Esq. n8 to Jeanne Bonney, Esq., n9 the City directed certain changes in its procedures for listing the names of inmates submitted to the Special Master for release under P 17 of the Stipulation and Agreement. Mr. Jordan stated: "while we are required to comply with the various orders regarding the release mechanism, there should be no presumption of releasability." (Memorandum, 8/5/92, P III). This action was taken, on the advice or at the instance of the District Attorney, without notice to or consultation with the plaintiff class, the Special Master, or this court, notwithstanding this court's regular communication with counsel at status hearings, and through the Special Master. [*15] n10

n8 Mr. Jordan is the Chair, Litigation Group, Office of the City Solicitor. "As a practical matter, [Mr. Jordan is] the City Solicitor in this case." (Statement of Mr. Jordan, Tr. 12/18/93, at 136).

n9 At that time Ms. Bonney was Director of the Prison Population Management Unit ("PMU"), an operation of The People's Bail Fund under contract to the City of Philadelphia to provide support services related to control of the

prison population. Among its several tasks, PMU listed pretrial detainees for release pursuant to P 17 of the Stipulation and Agreement. (Dep. Jeanne Bonney, at 22; Stipulation Nos. 8, 9). Since the beginning of 1993, tasks formerly performed for the City by the People's Bail Fund have been performed by the City's Pretrial Services Office.

n10 The Stipulation and Agreement was entered into on behalf of the City of Philadelphia -- a corporate entity -- by the former mayoral administration; the City remains bound by the Stipulation and Agreement even though a new Mayor has subsequently been elected.

[*16]

An important feature of the new procedure was the direction to:

"List by defendants, not by charge. This means that only defendants eligible for release under the criteria of the relevant orders should be listed. Please discontinue the prior practice of listing by the charged offense irrespective of whether the defendant in question is absolutely ineligible for release under the applicable criteria. Thus, you should not list any defendant with any outstanding charge or other matter which would disqualify that inmate from release under the provisions of the relevant Harris orders

(Memorandum, 8/5/92, P 1). The memorandum directed the PMU to discontinue listing four categories of detainees previously included on release lists: (i) inmates who have "other holds"; (ii) inmates held on enumerated charges who have state or federal detainers; (iii) inmates who on the face of their charges are not eligible for release; and (iv) inmates who are a danger to themselves or the community. Detainee in these categories "would have been listed under the prior practices" of the PMU. (Stipulation No. 30). The PMU instituted these changes as directed.

Mr. Jordan's memorandum "was intended [*17] . . . to change prior practices of . . . The [People's] Bail Fund that . . . were inconsistent with the requirements of the Consent Decree," that is, "that we were going beyond its requirements and we did not have to continue doing so." (Tr. 12/18/92, at 136 -37). However, there was no effort to determine whether the court shared this understanding

of the Stipulation and Agreement before the changes were unilaterally implemented.

Although the new procedures were formalized by the August 5, 1992, memorandum, the policy changes (with differences not material to determination of this Motion) were instituted by the PMU, at the direction of the City, the week of July 6, 1992. See Stipulations Nos. 17 - 46.

The four categories, their treatment prior to the change in City procedures, and the appropriateness of the changes in relation to the Stipulation and Agreement are discussed below:

### 1. Inmates With Other Holds.

This category includes inmates who are detained on enumerated charges and at least one non-enumerated charge. For some time prior to July 6, 1992, such inmates were included in the proposed release orders submitted by the City. "In this way, if and when all enumerated [*18] charges (or other holds) were subsequently dropped [or the inmate made bail on those charges], the inmate could be released immediately, instead of waiting approximately three to four weeks from that point to go through the release process." (Stipulation No. 18).

In a December 6, 1991, memorandum to the plaintiff class, the Special Master summarized the release procedures under the Stipulation and Agreement (see Stipulations Ex. A). A copy of this letter was received by both the City and its PMU. (Stipulation No. 5). The Special Master contemplated that a detainee in the "other holds" category would be listed for release on non-enumerated charges even if held on some other enumerated charge: "Many of the approved orders will not result in immediate release for the following reasons: . . . the inmate has other holds such as . . . more serious charges, and will remain in custody until the other holds are disposed." (Stipulations Ex. A.).

The Special Master's function with respect to the release mechanism is primarily "ministerial," *Harris v Reeves, 761 F. Supp. at 397,* but his explanation comports with the court's understanding, expressed at the inception [*19] of the Stipulation and Agreement, that: "The City will be able to submit the names of those inmates who were admitted to the prisons because they were charged with excepted offenses, [and who] are now eligible for release because the excepted charges have been dismissed but [who] are still held on non-excepted charges." *Harris v Reeves, 761 F. Supp. at 398*

Ms. Bonney testified that this policy was an effective means of ensuring that detainees were released from the prisons as soon as possible under the Early Release Mechanism: "We had internal documents to explain that . . . it made a difference. And as part of the statistics that

we provide to the City that go to the Special Master it gives the breakdown of all the people discharged under the category of other holds and how long it takes for them to get out and how they get out." (Bonney Dep., at 49). The Special Master provided statistics confirming Ms. Bonney's testimony. See 37th Report of the Special Master, Appendix K. The City stipulated that under its revised procedure, an inmate with "other holds" spends an additional "three to four weeks" in prison waiting for release under the Harris [*20] mechanism after bail is posted for enumerated charges or they are dismissed. (Stipulation No. 18). n11

> n11 See also Stipulations Ex. J. (memorandum, with population impact assessment, from Jean Bonney to J. Patrick Gallagher, Ph.D., Philadelphia Prisons Commissioner), estimating that a detainee whose "other holds" are disposed of by bail or otherwise spends 15 additional days in prison because HvL-SOB bail was not already entered on the non-enumerated charges.

The arguments of the City that the prior policy was "wasteful" and "ridiculous" (Memorandum of City, at 2) and of the District Attorney that it merely "created a massive paperwork shuffle" (Objections of District Attorney, at 3) cannot be credited. Indeed, both the City and the District Attorney have previously recognized that releasing detainees subject to other holds is an effective means of accomplishing the letter and the spirit of the Stipulation and Agreement. See Memorandum from the Special Master, August 19, at 2 (Stipulations Ex. D). [*21] n12

> n12 The Special Master states that the "genesis" of the policy of listing detainees with "other holds" was a suggestion by Assistant District Attorney Sarah Vandenbraak. At the meeting where she made this suggestion, the City agreed in principal, and argued that the Bail Commissioners should give only HvR-SOB bail on non-enumerated charges.

The Philadelphia courts have followed such a procedure since September 18, 1992, when the Municipal Court Bail Commissioners were instructed by Chief Deputy Court Administrator Kevin R. Murray to mark non-enumerated charges as HvL-SOB at arraignment. (Stipulation No. 62). Formerly, Municipal Court practice required "good bail" on all charges for any individual charged with at least one enumerated offense. (Stipulation No. 61). Because the Municipal Court has adopted

the PMU policy in effect prior to the August 5, 1992, memorandum, "other holds" should no longer be an issue as to persons admitted to the prisons after September 18, 1992. However, the Municipal Court procedure [*22] does not affect detainees already in prison on both enumerated and non-enumerated charges. (Tr. 12/18/92, at 145). n13

> n13 The Court: "From September 18th on, assuming your memorandum is followed, the problem will not exist for persons admitted to the prisons from then on, but it does exist for that population that has been admitted prior to September --"
>
> Mr. Jordan: "Yes, your Honor."

The court finds the City in contempt for its unilateral decision to modify the release mechanism with respect to detainees with "other holds." The City will be ordered to return to the practice prior to the August 5, 1992, memorandum and list for release inmates with "other holds," so long as that practice is necessary to enable the City to list 175 inmates per week. This procedure shall remain in place until the prison population is reduced below the MAP, or until court approval of a modification to the Stipulation and Agreement.

**2. Inmates Held on Enumerated Offenses Who Have State or Federal Detainers**

(a) Prior to [*23] the August 5, 1992, memorandum, inmates charged with enumerated offenses but subject to detainers from other jurisdictions, i.e., for parole or probation violations, were included in the proposed release orders submitted by the City. "PMU listed these individuals because it believed those individuals were eligible for release and there were other jurisdictions to which they could be sent." (Stipulation No. 20) As Ms. Bonney explained:

> We would list people that had . . . enumerated charges or in some cases people that were sentence deferred under the local charge if as a result of the Harris order being entered, they would be released to another jurisdiction to be returned for their next court date if the court date was more than two weeks away, because under local understanding it's acceptable to move someone out whose court dates are more than two weeks away. If they paid their own bail they would have gone [to the other jurisdiction].

(Bonney Dep. at 50 - 51). n14

> n14 Under this procedure, detainees are sent to the jurisdictions in which they were sentenced on the offense for which they are on probation or parole, where they may be sentenced for the violation, and returned to Philadelphia as necessary for hearings and trials on the offense for which they were arrested. "It's an economy of time . . . because if they are serving their sentence over there and waiting for our hearing, they are actually accomplishing more with their time because they won't be getting credit for their [parole or probation violation] sentence while they are here." (Bonney Dep., at 56 - 57).

[*24]

The August 5, 1992, memorandum asserted that "such persons are not required to be listed on the Harris release orders." However, in a letter dated January 17, 1992, the City notified this court that it "did not object to transferring inmates with state parole detainers pursuant to the March 11, 1991, Consent Order, whose underlying charges are enumerated in Paragraph 3A and B of the September 21, 1990, Order." (Letter from First Deputy City Solicitor T. Michael Mather to the Special Master, January 17, 1992, Stipulations Ex. D.) (see also Stipulation No. 21).

Because the City agreed to the procedure under the Early Release Mechanism, it was not appropriate for the City unilaterally to decree that it would be discontinued.

(b) This category also includes inmates brought to the Philadelphia prisons from other institutions, "on writ," for court appearances and other reasons, who have not been returned to the originating jurisdictions. "PMU listed inmates in this category if such an inmate were kept in the Philadelphia prison system two weeks after the event for which they were transferred." (Stipulation No. 22).

Persons in this category may be admitted to the Philadelphia [*25] prisons under the terms of the qualified admissions moratorium only "for immediate court appearances." See Order of October 7, 1991. n15 However, defendants "had an informal agreement . . . under which plaintiffs did not object to the transfer of inmates to Philadelphia for such purposes if the length of stay did not extend unreasonably beyond the trial date." (Stipulation No. 22). Accordingly, on May 20, 1992, the Special Master was informed that the City did not object to transfer of detainees in this category. (Stipulation No. 23). Beginning about May 29, 1992, the PMU included on release lists persons "who had come to Philadelphia on a writ of some kind and had not yet been returned to the jurisdiction in which they were incarcerated." (Bonney Dep., at 29). The Special Master would then order such persons returned to the originating jurisdictions. (See, e.g., Stipulation No. 24). The court was aware of this and considered it consistent with the Stipulation and Agreement.

> n15 The admission moratorium was originally established by P 5 of the 1986 Consent Decree, and is part-and-parcel of the Early Release Mechanism. See Stipulation and Agreement P 17(a), 18. The moratorium was amended most recently by Order of October 7, 1991.

[*26]

The manner in which the plaintiff class and defendants reached agreement concerning the treatment of persons "on writ" was appropriate. The parties consulted with the Special Master to avoid sanction by the court. As the parties then recognized, the policy agreed to was consistent with the Stipulation and Agreement. The decision of the City unilaterally to alter that policy, and the revised policy it implemented, were not consistent with either the letter or the spirit of the Stipulation and Agreement.

### 3. Inmates Who On the Face of Their Charges are Not Eligible for Release.

Some detainees charged with aggravated assault -- an enumerated offense -- have been listed for trial in Municipal Court. "Even though aggravated assault is an enumerated offense, PMU concluded that the aggravated assault charge must have been dropped, without correction of the computer record, because aggravated assault is a felony and felony trials are not assigned to Municipal Court." (Stipulation No. 25)

Some detainees are charged with Possession of an Instrument of Crime ("PIC"), and detained for failure to post bail of less than $ 50,000. PIC is not an enumerated offense, but commission of a crime [*27] with a gun, knife, or explosive is an enumerated offense. "Because charging information regarding the precise weapon alleged was in the hands of the district attorney, but not PMU, PMU listed the detainee with PIC for release, providing an opportunity for the district attorney's office to object to the release if the release criteria were not met." (Stipulation No. 19). n16

> n16 This category of detainee is apparently limited to persons charged with robbery and PIC

where PMU claims it was unable to determine if the instrument of crime was a gun, knife, or explosive, or some other instrument. (see Bonney Dep., at 60).

Ms. Bonney testified that "it had been our experience in handling these kinds of records issues that the best information is the court file or the DA's file, and in some cases [that was] the only way to find out, because the court people can't tell from their computers." (Bonney Dep., at 41).

Nevertheless, such persons were not appropriately listed for release. Ms. Bonney testified, "the burden [*28] is on the City to actively pursue the information to determine whether a person is eligible or not." (Bonney Dep., at 40). Ms. Bonney, director of the PMU, was acting on behalf of "the City." Shifting "the burden" to the District Attorney in a manner not contemplated by the Stipulation and Agreement, whatever the motivation, was not appropriate.

As with the other categories, the court regrets that the City unilaterally altered the manner in which the Early Release Mechanism was administered. However, with respect to this category the policy change was not in contempt of this court's Order of March 11, 1991, because it was consistent with that Order.

### 4. Inmates Who are a Danger to Themselves or the Community.

The City unilaterally determined to stop listing inmates whose bail is set at $ 75,000 and higher, or who have mental health problems. (Stipulation No. 58). The Stipulation and Agreement, at P 17(e), states: "Inmates to whose release the District Attorney objects on public safety grounds shall not be released if, but only if, the District Attorney designates for release an equivalent number of inmates who are eligible for release." (See Stipulation No. 15).

Despite [*29] this clear provision in the Stipulation and Agreement, the City took the position that "the decrees and orders do not require us to list persons who are a danger to themselves or to the community." (Memorandum, 8/5/92, P IV). In a letter to the Special Master, dated August 13, 1992, Mr. Jordan stated his "understanding that both by the terms of the Consent Decree, and by longstanding practice, such defendants are not to be listed." (Stipulation, Ex. L). n17

n17 Attached to the Letter was an intra-office memorandum concerning the District Attorney's objections to inclusion in Lists No. 396, 398, and 399 of eleven detainee who were alleged

drug crime conspirators. The memorandum did not propose other detainees for listing in lieu of those proposed for withdrawal.

In view of the bail practices in effect since implementation of the Stipulation and Agreement, and the temptation to overcome the release of certain pretrial detainees by setting high bail, it cannot be assumed by the City that bail in set amount necessarily [*30] marks persons who are a danger to the community. Moreover, the decision not to release for "dangerousness" is expressly that of the Special Master under the Stipulation and Agreement. The District Attorney could prevent such a release by substitution but has never availed itself of the opportunity to do so. Instead, it has occasionally requested special exceptions that have almost always been granted by the Special Master or the court. (See, e.g., Stipulations Ex. L).

The District Attorney argues that "[the] obligation to release defendants as a population control method was limited by the provision [of the December 30, 1986, Consent Decree] that 'the City defendants agree not to seek the release of any person whose release would constitute an imminent threat to public safety.' (12/30/86 Consent Decree P 4, p. 8)." (Objections of the District Attorney, at 4). That provision of the 1986 Consent Decree was superseded by P 17(e) of the Stipulation and Agreement, which provides: "Inmates to whose release the District Attorney objects on public safety grounds shall not be released if, but only if, the District Attorney designates for release an equivalent number of inmates who are [*31] eligible for release." Under the District Attorney's interpretation, P 17(e) would be surplusage. n18

n18 The City's decision simply to delete certain drug defendants and other "dangerous" detainees from release lists (see, e.g., Stipulation Nos. 32, 33, 64) is particularly disturbing to this court in light of the court's clear instruction that "the District Attorney may use this process [P17(e)] to prevent the release of inmates charged with non-excepted drug offenses if he believes they present a particular threat to public safety." *Harris v. Reeves, 761 F. Supp. at 398*

In a memorandum from Mr. Jordan to Ms. Bonney, dated September 24, 1992, Mr. Jordan "directed the PMU to resume listing all candidates who might have fallen into the category of 'persons who are a danger to themselves or the community,' but to submit those names separately under protest." (Stipulation No. 65). Subsequently, the City began submitting release lists captioned

"B List" and "D List." On the "B" list [*32] the City lists for release those inmates who are held on bail of $ 75,000 or more, and on the "D" list, the City lists those inmates whose records reflect a need for special mental health treatment. (Stipulation No. 65). Each of these lists includes the following general disclaimer: "Because the defendants named herein pose an even greater than usual potential risk of danger to the community and/or themselves, the City submits this list under protest, pending modification of the decree." By the September 24, 1992, memorandum, a copy of which was submitted to the Special Master, the City conceded there was no basis under the Stipulation and Agreement for unilaterally excluding this category of detainees from release lists. n19

> n19 See also Stipulation No. 40: "The March 11, 1991, Order contains no such exception to the release mechanism."

Of course the court does not wish dangerous offenders released to the street. Were the District Attorney participating in the process in good faith, the provisions of the Stipulation [*33] and Agreement would function to prevent such releases. See Stipulation and Agreement, P 17(e). The amount of bail is an inadequate determination of "dangerous" or non-releasable detainees, because whatever the arbitrary limit, the Stipulation and Agreement is too easily circumvented.

With respect to detainees on the "D" list, the court agrees that inmates suffering from mental illness are poor candidates for release; such persons are not appropriately in the general population of the prisons in the first place. Jail is not a mental institution or treatment facility. Such persons should be held, if at all, in the Prison Health Services Wing (PHSW), which is not subject to the Stipulation and Agreement. Were they held there, they would properly be excluded from release lists. If the City was in compliance with the Stipulation and Agreement, there would be no need for a "D" list.

The court finds the City in contempt for its unilateral decision to modify the release mechanism with respect to detainees deemed "a danger to themselves or the community." The City is directed to discontinue the practice of submitting "B" and "D" lists and of noting general objections. Such practices are [*34] not contemplated by the Stipulation and Agreement and are in derogation of P 17.

**D. SANCTIONS.** Both the 1986 Settlement and the 1991 Stipulation and Agreement were entered as Orders of this court. This court has the obligation and the power to compel compliance and punish non-compliance

through contempt sanctions. See *Interdynamics, Inc. v. Firma Wolf, 653 F.2d 93, 96 (3d Cir. 1981)* (court has power to enforce consent decrees), cert. denied, *454 U.S. 1092, 70 L. Ed. 2d 631, 102 S. Ct. 658 (1981); Latrobe Steel Co. v. United Steelworkers, 545 F.2d 1336, 1344 (3d Cir. 1976)* (coercive civil contempt sanctions "look to the future" to compel compliance; compensatory civil contempt sanctions seek to "compensate the complainant" for damages caused by past disobedience). See also Stipulation and Agreement, at P 30 ("Nothing herein is intended to restrict the Court's authority to issue contempt citations or its power under the All Writs Act.").

[HN6] Determining sanctions for civil contempt is committed to the sound discretion of the trial court. See *Elkin v. Fauver, 969 F.2d 48, 52 (3d Cir. 1992),* [*35] cert. denied, *121 L. Ed. 2d 379, 113 S. Ct. 473 (1992).* Here, the parties have stipulated to the manner of imposing sanctions for non-compliance with the Early Release Mechanism. Paragraph 19 of the Stipulation and Agreement provides:

> b. Defendants shall be assessed $ 100.00 per day for each inmate

> (1) who is admitted into the Philadelphia Prisons in violation of the qualified admissions moratorium;

> (2) who should be designated for release in accordance with Paragraph 17 but is not so designated; or

> (3) who is not released after receipt of a release order pursuant to Paragraph 17.

> c. Defendants shall not incur fines pursuant to Paragraph 19.b(2) if they submit to the Special Master at least thirty-five (35) names per day meeting the other requirements of Paragraph 17, even if a greater number of inmates meets the criteria set forth in Paragraph 17.a.

> d. The provisions of this paragraph shall apply only on days that the MAP is exceeded, and no penalty shall be assessed with respect to the admission or custody of any inmate which is predicated on erroneous information supplied by a

third party on which the defendants reasonably relied.

"The [*36] Stipulation and Agreement requires the imposition of fines if the City fails to submit 175 petitions only if there are 175 eligible inmates." *Harris v Reeves, 761 F. Supp. at 397 n 17.* Beginning the week of August 10, 1992, the PMU began keeping a so-called "A list," which "contained the names of inmates who would have been listed for release, but for James Jordan's August 5 memorandum." (Stipulation No. 51). During the 15 week period from August 10, 1992, to November 16, 1992, the City submitted lists with a total of 1059 names ("actual submissions"). Had 175 names been submitted for each of those weeks, the total would have been 2625 names ("theoretical maximum submissions"). However, during some weeks, the "A" lists show something less than 175 available names: n20 the total is 2020 ("stipulated maximum submissions") (Stipulation Nos. 70 - 77, 81 - 87). n21 In addition, during the 5 week period from July 6 to August 7, 1992 -- before the August 5, 1992, memorandum, but after informal institution of the new policy -- the City listed 866 names ("actual submissions"). Had 175 names been submitted for each of those weeks, the total would have been 965 [*37] ("theoretical maximum submissions"). Ms. Bonney testified that under its prior practice the PMU could have listed 175 names for each of those weeks, for a total of 965 ("stipulated maximum submissions"). (Stipulation Nos. 43, 45).

n20 Ms. Bonney testified the PMU might have been able to identify others for inclusion in the "A" lists, but for the additional resources the PMU was expending to comply with the August 5, 1992, memorandum. (Bonney Dep., at 43 - 44).

n21 Paragraph 19 of the Stipulation and Agreement does not mean that no fine can be imposed for weeks when 175 eligible names were not available, if the City submitted fewer names than were actually available. Where more than 175 inmates were eligible in a week, the City was not required to list more than 175. Where less than 175 names were eligible, the City was required to list them all. In reaching the 2,020 figure, the court did not count any amount on a given "A" list in excess of 175.

Therefore, 1,060 additional detainees would have been listed by [*38] the City had it not unilaterally changed the manner in which these lists were generated. n22 Under P 19 of the Stipulation and Agreement, this shortfall results in a minimum assessment against defen-

dants of $ 106,000. Since P 19 contemplates a fine of $ 100 per inmate per day for each inmate not listed, the fine might be much higher. However, plaintiff class is seeking a fine of almost precisely this amount: "What we're seeking from the Court is an order holding the City in contempt, declaring that the changes interposed by Mr. Jordan's memo are not proper interpretations of the order, and, three, granting the plaintiffs fines of $ 100 per day or per list times the 1,069, or $ 106,900." (Lebowitz, Tr. 12/18/92, at 131). A fine in excess of this amount is not necessary to compensate plaintiffs for the City's conduct or to compel the City's future compliance with the March 11, 1991, Order of this court.

n22 Stipulated maximum submissions (2,020 + 965 = 2,985) less actual submissions (1,059 + 866 = 1,925) equals 1,060. At the hearing, counsel for the plaintiff class stated the shortfall reflected on the "A" lists was 1,069. The court's figure covers an additional five weeks, but does not include for any week the amount by which an "A" list exceeded 175 names. (Lebowitz, Tr. 12/18/92, at 121). See Stipulation and Agreement P 19(c) ("Defendants shall not incur fines . . . if they submit to the Special Master at least thirty-five names per day . . . even if a greater number of inmates meets the criteria . . . .").

[*39]

As to the category of detainees referred to as "inmates who on the face of their charges are not eligible for release," the court found no contempt. However, the impact of the policy change with respect to this category was de minimis. See Stipulation No. 57. Nevertheless, imposing a lower fine than that urged by the plaintiff class takes into account that the plaintiff class did not fully prevail on this Motion.

At P 30, the Stipulation and Agreement states:

As a possible alternative or concurrent mechanism to the release mechanisms provided in Paragraph 17, defendants shall formulate, for submission to the Court, other criteria and procedures for the release of inmates (e.g., those inmates who are not afforded a speedy preliminary hearing, trial, or sentencing).

At the hearing on this Motion, the court stated that it did not "intend to disregard" the sanctions scheme set forth

in P 19, but that it was not clear "that the only appropriate sanction is monetary." (Tr. 12/18/92, at 177). "One possible sanction is to compel the City to comply with [P 30]," (Tr. 12/18/92, at 132), that is, "to order the City to formulate and submit to the Court other criteria and [*40] procedures for the release of inmates." (Tr. 12/18/92, at 177). Such an additional requirement is appropriate and justifies imposition of less than the maximum fine.

Accordingly, the court will order a fine in the amount of $ 106,000, of which $ 55,000 is to be paid forthwith. These funds will be used for the benefit of the plaintiff class. The court will allow the City until July 30, 1993, to comply with P 30 of the Stipulation and Agreement. Upon satisfactory compliance, the remainder of the fine may be discharged. In the event that compliance with P 30 is not forthcoming by that date, the City will be required to pay the balance of the fine. In this way the plaintiff class will be compensated for the City's disobedience of the court's March 11, 1991, Order, the authority of this court will be vindicated, and the City will be compelled to comply with the Stipulation and Agreement in the future, and to propose any desired changes in accordance with the method provided by the Stipulation and Agreement.

[HN7] In civil contempt cases, "compensatory sanctions . . . must not exceed the actual loss suffered by the party that was wronged." *Elkin, 969 F.2d 48*. It [*41] is not necessary to determine the "actual loss," because the Stipulation and Agreement provides a form of liquidated damages, and here the court is imposing sanctions in an amount less than that to which the parties stipulated. Moreover, these sanctions are not only compensatory, but seek to coerce the City's compliance with the Stipulation and Agreement in the future.

## III. CONCLUSION.

This action has been before this court for over ten years; the parties have sought to achieve a workable solution to a seemingly "intractable" state of affairs, (Jordan, Tr. 12/18/93, at 150), by a long term planning process, new construction, and short term relief. The City voluntarily entered into the Consent Decree and the subsequent Stipulation and Agreement, including the Early Release Mechanism. "The Mayor has concluded that the City cannot afford the moral, social or economic cost of holding too many inmates in jails designed to accommodate many fewer. . . . By accepting the provisions of the Stipulation and Agreement, the City, through its Mayor, has weighed competing concerns and has chosen to strike a balance where the 'public interest' is deemed best served." *Harris v. Reeves, 761 F. Supp. at 399 - 401* [*42]

The City, not merely its past administration, remains party to the Stipulation and Agreement. The present administration may wish to strike a new "balance between the legitimate interest in public safety . . . versus the need to create proper and decent conditions within the prisons," (Jordan, Tr. 12/18/93, at 156 - 57), but that is no justification for implementing procedural changes under the Stipulation and Agreement without consultation with the plaintiff class or prior approval of this court.

The Stipulation and Agreement, at P 30, includes a procedure whereby the parties may propose changes. The City could have exercised this provision if it found the Early Release Mechanism undesirable. n23 "[As with] any other contract, the breaching party will not be heard to say that performance on its part proved more burdensome . . . than it had anticipated." *Public Interest Research Group of New Jersey, Inc. v. Ferro Merchandising Eqpt. Corp., 680 F. Supp. 692, 694 (D.N.J. 1987).* Mr. Jordan, the City's attorney directly responsible for dealing with this court on this matter, has stated: "The Mayor understands and respects [that] our best guarantee of completion [*43] of our [prison population] projects is the Court's continued stewardship." (Tr. 12/18/92, at 140). The City's decision unilaterally to alter the manner in which the Early Release Mechanism was administered was in derogation of its duty to the plaintiff class and to this court

> n23 Presently pending before the court is the defendant's Motion to Modify the Consent Decree. Because of the City's actions in derogation of the schedule established by the court's Order of January 6, 1992, a decision on that Motion has been delayed. See Order of January 11, 1993. Cf. *Rufo v. Inmates of Suffolk County Jail, et al., 116 L. Ed. 2d 867, 112 S. Ct. 748 (1992).* A hearing on that motion is now set for December 20, 1993 (Order of June 11, 1993).

An appropriate Order follows.

## ORDER

AND NOW, this 14th day of June, 1993, upon consideration of Plaintiffs' Motion for Contempt Sanction Against Defendants for Failure to Comply With the Court's March 11, 1991 Order, Defendants' Response in Opposition, the District [*44] Attorney's Objections in the Nature of a Response to Parties' Positions on Contempt Sanctions, the Stipulated Facts, after a hearing, and for the reasons stated in the accompanying Memorandum, it is **ORDERED** that:

1. Said Motion is **GRANTED**.

1993 U.S. Dist. LEXIS 7850, *

2. The City of Philadelphia is adjudged IN CONTEMPT of this court's Order of March 11, 1991.

3. A FINE in the amount of $ 106,000 is ASSESSED against the City as compensation to the plaintiff class for past disobedience to said Order and to compel future compliance.

4. The City shall pay $ 55,000 forthwith.

5. The City may submit to the Special Master, on or before July 30, 1993, an alternative Plan in accordance with P 30 of the Stipulation and Agreement, and a proposal to ensure that mentally ill persons are not housed in the general population of Philadelphia prisons. Prior to submitting any such plans, drafts shall be submitted to the Special Master and provided to counsel for the plaintiff class, for review and comment Thereafter, the Special Master shall forward same to the court with recommendations.

6. If the City does not submit plans by July 30, 1993, the balance of the fine shall be paid by that date. If the City [*45] does submit plans, the court will determine by August 6, 1993, whether the plans warrant discharge of the balance of the fine.

7. Class counsel may submit a proposal for the use of the fine and a petition for counsel fees in connection with these contempt proceedings, or counsel may defer their request for funds until after August 6, 1993, when the total amount of the sum due will have been finally determined.

Norma L. Shapiro, J.